UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| THE VALSPAR CORPORATION, AND VALSPAR SOURCING, INC.,<br><br>        Plaintiffs,<br><br>  v.<br><br>E.I. DUPONT DE NEMOURS AND COMPANY, HUNTSMAN INTERNATIONAL LLC, KRONOS WORLDWIDE, INC., AND MILLENNIUM INORGANIC CHEMICALS, INC.,<br><br>        Defendants. | Court File No.  13-3214<br><br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

For their complaint against Defendants E.I DuPont de Nemours and Company ("DuPont"), Huntsman International, LLC ("Huntsman"), Kronos Worldwide, Inc. ("Kronos"), and Millennium Inorganic Chemicals, Inc. ("Millennium") (collectively, "Defendants"), Plaintiffs The Valspar Corporation and Valspar Sourcing, Inc. (collectively, "Valspar"), state and alleges as follows:

**INTRODUCTION**

1.      Defendants and their co-conspirators are the dominant suppliers of Titanium Dioxide in the United States.

2.      Defendants own and supply more than 90% of the United States' demand for Titanium Dioxide.  Titanium Dioxide is a dry chemical powder, which is used in coatings such as paint, cosmetics, plastics and paper industries.

3.      Defendants earn billions of dollars in revenues from the sale of Titanium Dioxide.

4.      Defendants and other non-party co-conspirators intentionally conspired and agreed to manipulate, fix, raise, maintain, and stabilize the market and price at which Titanium

Dioxide is sold in the United States.  The alleged conspiracy was hatched and implemented in the United States for the purpose of acting anti-competitively, resulting in unconscionable, unfair, and deceptive overcharging of Valspar.

5.       Defendants' unlawful conspiracy was initiated, developed, and maintained by a course of anticompetitive conduct, including agreements, secret meetings and communication between and among Defendants and their co-conspirators for the purpose of artificially inflating the price of Titanium Dioxide and allocating the United States marketplace.  While in secret discussions, Defendants exchanged commercially sensitive and proprietary information relating to the sales, production, supply, inventory, marketing and pricing of Titanium Dioxide, as well as the raw materials necessary to manufacture Titanium Dioxide itself.

6.       In order to perpetuate this unlawful conspiracy, Defendants and their co-conspirators engaged in fraudulent and deceptive behavior to hide and conceal their behavior from Valspar and other purchasers.

7.       As a result of Defendants' fraudulent, deceptive, unconscionable, unfair and anticompetitive behavior, the United States marketplace for Titanium Dioxide was controlled and manipulated while prices for Titanium Dioxide were artificially inflated.

8.       Because Valspar paid a price for Titanium Dioxide products that was higher than what it would have paid in a competitive marketplace, it suffered economic damages as a result of Defendants' wrongdoing.  Thus, Valspar brings this lawsuit to recover actual and/or compensatory damages and to enjoin Defendants and their co-conspirators from engaging in their unlawful and anticompetitive behavior.

9.       Valspar opted out of the class action initiated on February 9, 2010, by Haley Paint Company captioned *Haley Paint Co. v. E.I. DuPont de Nemous and Co., et al*., 1:10-cv-00318

RDB, and venued in the United States District Court for the District of Maryland, and the class action initiated on March 15, 2013, by Los Gatos Mercantile, Inc., and others captioned *Los Gatos Mercantile, Inc. d/b/a Los Gatos Ace Hardware, et al. v. E.I. DuPont de Nemous and Co., et al*., Case No. 3:13-cv-01180-SI, and venued in the United States District Court for the Northern District of California.

## JURISDICTION AND VENUE

10.    Valspar brings this action to recover actual and/or compensatory damages, double and treble damages as permitted, pre- and post-judgment interest, costs, and attorneys' fees. Valspar also seeks nationwide injunctive relief.  Valspar brings this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure equitable and injunctive relief against Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1).  Valspar also asserts claims for actual and exemplary damages pursuant to state antitrust, unfair competition, and consumer protection laws, and seeks to obtain restitution, recover damages, and secure other relief against Defendants for violation of those state laws.  Valspar also seeks attorneys' fees, costs, and other expenses under federal and state law.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331.

11.    Venue and personal jurisdiction are proper in this judicial district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22).  Personal jurisdiction is proper in this district as each defendant resides, is found, transacts business, or has an agent in the United States, including in this district. Venue is also proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c), and because at least one of the Defendants resides in this judicial district, is licensed in or is conducting business in this judicial district.

## PARTIES

12.     The Valspar Corporation is a Delaware corporation with its principal place of business in Minneapolis, Minnesota.  Valspar is one of the largest global coatings manufacturers in the world and produces, among other products, paints, varnishes, and stains.  Valspar purchased Titanium Dioxide directly from one or more of the Defendants during the relevant times alleged herein, and has suffered antitrust injury as a result of Defendants' conduct as alleged in this Complaint.

13.     Valspar Sourcing, Inc., is a Minnesota corporation with its principal place of business in Minneapolis, Minnesota.  Valspar Sourcing, Inc., is a wholly owned subsidiary of The Valspar Corporation.  Valspar Sourcing, Inc., purchased Titanium Dioxide directly from one or more of the Defendants during the relevant times alleged herein, and has suffered antitrust injury as a result of Defendants' conduct as alleged in this Complaint.

14.     Defendant E.I. DuPont de Nemours and Company ("DuPont") is a Delaware corporation with its principal place of business in Wilmington, Delaware.  During the relevant times alleged herein, DuPont manufactured and sold Titanium Dioxide in the United States through DuPont or through DuPont's predecessors, affiliates, and/or subsidiaries. ,DuPont is the largest producer and supplier of Titanium Dioxide in the world, and it owns and controls approximately half of the Titanium Dioxide production capacity in North America.  DuPont has U.S. manufacturing plants in Delaware, Florida, Mississippi, and Tennessee.  DuPont receives billions in revenues from the production of Titanium Dioxide used in coatings and colors of various products marketed and sold throughout the United States directly and through the Internet.  Valspar purchased these products in the United States.  Defendant DuPont conducted business in this district.

15.     Defendant Huntsman International, LLC ("Huntsman"), is a Delaware limited liability company with its principal place of business in Salt Lake City, Utah.  During the relevant times alleged herein, Huntsman manufactured and sold Titanium Dioxide in the United States through Huntsman or through Huntsman's predecessors, affiliates, and/or subsidiaries, including Tioxide Americas, Inc., an indirect subsidiary of Huntsman and a direct subsidiary of Tioxide Group (a UK company), which is wholly-owned by Huntsman.  Huntsman is the fourth largest Titanium Dioxide global producer and has annual sales in the billions of dollars. Defendant Huntsman conducted business in this district.

16.     Defendant Kronos Worldwide, Inc. ("Kronos," formerly known as Kronos, Inc.), is a Delaware corporation with its principal executive offices in Dallas, Texas, and its principal North American sales, marketing, and technical offices in Cranbury, New Jersey.  Kronos and Huntsman (through a subsidiary, Huntsman Holding, LLC) jointly operate (50/50) a Titanium Dioxide manufacturing venture, Louisiana Pigment Company, L.P., in Lake Charles, Louisiana. During the relevant time periods alleged herein, Kronos manufactured and sold Titanium Dioxide in the United States through Kronos or through its predecessors, affiliates, and/or subsidiaries.  Kronos is the fifth largest global producer of Titanium Dioxide and has net sales of more than a billion dollars.  Defendant Kronos conducted business in this district.

17.     Defendant Millennium Inorganic Chemicals, Inc. ("Millennium"), is a Delaware corporation with its principal place of business in Hunt Valley, Maryland.  During the relevant time periods alleged herein, Millennium manufactured and sold Titanium Dioxide in the United States.  Together with its alter-ego and in a joint-venture, Millennium and co-conspirator National Titanium Dioxide Company Limited (d/b/a Cristal, a Saudi Arabian corporation) are the second largest global producers of Titanium Dioxide and have combined sales of more than a

billion dollars.  Prior to its acquisition by Cristal in 2007, Millennium comprised the Titanium

Dioxide business of Lyondell Chemical Company.  During the relevant times alleged herein,

Millennium operated plants in Ashtabula, Ohio, and Baltimore, Maryland.  Defendant

Millennium conducted business in this district.

**AGENTS AND CO-CONSPIRATORS**

18.     Each Defendant acted as the principal of or agent for the other Defendants with

respect to the acts, violations, and common course of conduct alleged in this Complaint.

19.     Various persons, partnerships, sole proprietors, firms, corporations, and

individuals not named as Defendants in this lawsuit, the identities of some of which are presently

unknown to Valspar, have participated as co-conspirators with Defendants in the offenses

alleged in this Complaint, and have performed acts and made statements in furtherance of the

conspiracy or in furtherance of the anticompetitive conduct.

20.     Unnamed co-conspirator National Titanium Dioxide Company Limited (d/b/a

Cristal, a Saudi Arabian corporation) is a Saudi Arabian corporation with its principal place of

business in Jeddah within the Kingdom of Saudi Arabia.  During the relevant period alleged

herein, Cristal manufactured and sold Titanium Dioxide to purchasers in the United States and

elsewhere, directly or through predecessors, affiliates, and/or subsidiaries, including Defendant

Millennium.

21.     Unnamed co-conspirator Lyondell Chemical Company ("Lyondell") is a

Delaware corporation with its principal place of business in Houston, Texas.  During the relevant

time periods alleged herein, Lyondell manufactured and sold Titanium Dioxide to purchasers in

the United States and elsewhere, directly or through predecessors, affiliates, and/or subsidiaries,

including a wholly-owned subsidiary that is the predecessor of Defendant Millennium. Lyondell

acquired its Titanium Dioxide business as part of its acquisition of Millennium Chemicals, Inc.,

in 2004.  In 2005, Lyondell was the second-largest global producer of Titanium Dioxide and earned more than a billion dollars in revenue.  Lyondell sold its Titanium Dioxide business (the predecessor of Millennium) to Cristal in 2007.

22.     Unnamed co-conspirator Tronox Inc. ("Tronox"), is a Delaware corporation with its principal place of business in Oklahoma City, Oklahoma.  During the relevant time periods alleged herein, Tronox manufactured and sold Titanium Dioxide to purchasers in the United States through itself or through its predecessors, affiliates, and/or subsidiaries.  Tronox is the world's third largest producer of Titanium Dioxide.  In 2006, Tronox earned hundreds of millions of dollars in net sales of Titanium Dioxide in the United States.  It owns plants in Hamilton, Mississippi, and Savannah, Georgia.  Prior to becoming a publicly traded company in November 2005, Tronox was a wholly owned subsidiary of Kerr-McGee Corporation and was acquired by Anadarko Petroleum Corporation in 2006.

23.     Unnamed co-conspirator International Business Management Associates, Inc. ("IBMA"), is a Delaware corporation, and its principal place of business is believed to be in Plainsboro, New Jersey.

24.     Unnamed co-conspirator James R. Fisher is the President and Chief Executive Officer of IBMA and has held this role at all relevant times.  IBMA is Mr. Fisher's alter ego. Mr. Fisher has been a consultant to the Titanium Dioxide industry for many years, including before and during the relevant time periods alleged herein. Prior to working as a consultant to the industry, he was employed by Defendant Kronos.  Mr. Fisher was a main actor and perpetuator of the sharing of nonpublic, commercially sensitive information concerning Titanium Dioxide between and among Defendants and their co-conspirators.  He has also been an agent and co-conspirator of one or more Defendants.

25.     Whenever in this Complaint reference is made to any act, deed, or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's or limited liability entity's business or affairs.

26.     Defendants are liable for unlawful acts performed in furtherance of the alleged anticompetitive price-fixing conspiracy by companies acquired through mergers and acquisitions.

27.     During the relevant time periods alleged in this Complaint, the Defendants and co-conspirators engaged in anticompetitive and unlawful conduct and control of the Titanium Dioxide market affecting trade and commerce throughout the fifty (50) states, including this judicial district.

## BACKGROUND

**A.      Background Regarding Titanium Dioxide**

28.     Titanium Dioxide is a dry chemical powder that is primarily used as a white pigment.  It is the world's most widely used pigment for whiteness, brightness, and masking of colors in paints and coatings.  Titanium Dioxide is consumed in 170 countries.  Titanium Dioxide is considered very valuable in markets such as the United States, and its use in consumer goods increases the quality of life for consumers, providing a life-style product that enhances their standard of living.

29.     Titanium Dioxide traps and reflects light better than almost any known substance. The vast majority (90%) of Titanium Dioxide is consumed in the United States in the paint, coatings, plastics, and paper industries.  It is nonflammable and nontoxic, and has replaced lead compounds in residential paints.  The primary function of Titanium Dioxide is to whiten or

brighten paint, paper, and plastic.  The chemical is also used in synthetic fiber production and to make inks, pharmaceutical coatings, toothpaste, sunscreen, cosmetics, food, rubber, ceramic, and other products.

30.     There are no viable white pigment competitive substitutes for Titanium Dioxide in consumer products.  Because Titanium Dioxide's masking or pacifying ability is very unique, there is no technical substitute for the product.  Titanium Dioxide also has great resistance to other chemicals, to ultraviolet degradation and has very good heat stability.  Titanium Dioxide's artificially inflated and supra-competitive prices are achieved with no competitive white pigment substitute.  Even though the price is manipulated and unconscionably high, competitors have difficulty entering into and competing for Titanium Dioxide for use of in consumer goods, including paints and other coatings.  Thus, Valspar has no alternative but to pay the unfairly fixed and maintained price set by Defendants.

31.     Titanium is the ninth most abundant element in the Earth's crust.  It is typically found along with iron in a mineral oxide called ilmenite and also in a less common ore called rutile.  The majority of titanium production is used to make Titanium Dioxide.  The Titanium Dioxide manufactured for commercial use is derived from the mining of ilmenite and rutile.  Manufacturers typically sell Titanium Dioxide in powder form after mining it and separating it from titanium ore.

32.     Titanium Dioxide is manufactured using two different processes, sulphate and chloride, which create two crystal forms, rutile and anatase.  The sulphate process uses concentrated sulfuric acid to extract Titanium Dioxide from ilmenite or titanium slag.  The chloride process uses petroleum coke to convert rutile to titanium tetrachloride, which is then converted into Titanium Dioxide through contact with superheated oxygen or air.

33.     Most Titanium Dioxide plants utilize the chloride manufacturing process because, among other advantages, it generates less waste.  Defendants and their co-conspirators operate most of the chloride process plants in the world.  Although both the sulphate and chloride processes create the rutile crystal form of Titanium Dioxide, only the sulphate process produces the anatase form, which is less durable than rutile.  Anatase is preferred in food, drug, and cosmetic products.  The rutile form of Titanium Dioxide fulfills more than 80% of the world's requirements for Titanium Dioxide.  After Tronox's predecessor, Kerr-McGee, closed its sulphate process plant in 2004, the chloride process has been the only process used to produce Titanium Dioxide in the United States.

34.     Titanium Dioxide is a homogeneous commodity chemical that is sold in rutile and anatase grades worldwide.  Titanium Dioxide grades feature degrees of brightness and whiteness, and most are made by adjusting the size of the Titanium Dioxide particles.  Most grades are sold in fine powder form, but a few are sold in other forms, including ultrafine powder, water slurry (aqueous solutions), and a coarse, nonpigmentary form (such as for use in glass and ceramic manufacturing).

**B.      The Titanium Dioxide Industry**

35.     Grades of Titanium Dioxide supplied by one producer are readily substituted for grades of Titanium Dioxide supplied by other producers.  Accordingly, buyers make purchase decisions based largely, if not entirely, on price, which made it easier for Defendants and their co-conspirators to reach agreement on prices and to monitor each other's compliance with their agreements.

36.     All Defendants make and sell rutile grades of Titanium Dioxide, which comprise more than 80% of Titanium Dioxide sales, and which are sold primarily to United States customers in the paint, coatings, and plastic industries.  All Defendants except for DuPont make

10

and sell anatase grades.  The rutile crystalline form of Titanium Dioxide has a higher refractive index and is more durable than anatase.  Generally speaking, rutile grades are preferred for outdoor uses by customers in the coatings and plastics industries (the largest end-use applications for Titanium Dioxide), whereas anatase grades are preferred by customers in the food, drug, and cosmetic industries.  Approximately 90-95% of Titanium Dioxide annual sales are made to customers in the coatings, plastics, and paper industries, and all Defendants sell grades of Titanium Dioxide to customers in these industries.

37.     During the relevant times alleged herein, Defendants and their co-conspirators dominated and controlled the Titanium Dioxide market in the United States.  Defendants and their co-conspirators control well the entire capacity in the United States and more than 70% of the world's Titanium Dioxide capacity.  Because of this market domination, Defendants and their co-conspirators are able to engage in unfair and anticompetitive behavior, overcharging paint manufacturers in the United States.

38.     The Titanium Dioxide industry has high barriers to entry.  For example, a new "greenfield" one-hundred kilotons-per-year plant has been estimated to cost approximately $450-$500 million, and require a three-to-five-year lead time to build.  The Defendants also have cost advantages and proprietary technologies that effectively deter new entrants.  Such barriers are conducive to a conspiracy because they protect existing suppliers from competition and maintain the high concentration of the Titanium Dioxide industry.

39.     Titanium Dioxide producers, including Defendants, face similar costs.  Because the Defendants face similar costs, their pricing preferences tend to be aligned.  This alignment and unity of interest make it much easier for them to agree to and defend an agreement on price increases, thus manipulating the Titanium Dioxide market capacity and expansion of supply.

The manipulation of the production and supply further creates the opportunity for an unlawful uniform conspiracy to artificially inflate the price charged for Titanium Dioxide.

40.     In the 1990s, the titanium dioxide industry suffered substantial declines in consumption and price.  A Huntsman marketing report in 2001, for example, indicated that the real price per ton of titanium dioxide plummeted from $3,200 in 1991 to $1,900 in 2000.  In 2001, two titanium dioxide plants—Millennium's plant in Baltimore, Maryland, and Kerr-McGee's plant in Antwerp, Belgium—"were forced" to close, and the pigment producers were "bloodied badly" by falling prices and reduced profit margins.  Ian Edwards, DuPont's Global Business Director, was quoted as saying that in 2001 "capacity utilization was lower than at any point in the 1990s," while Gary Cianfichi, Millennium's Director of Sales for Europe, explained that prices declined by about 15 percent due to poor demand, utilization, and operating rates.

41.     In and around 2005, allegedly to reduce the costs of importing Titanium Dioxide manufactured abroad into North America, Defendant Huntsman purportedly reduced its sales (and, presumably, its market share) in North America.  Nevertheless, the Defendants' domestic and global market shares remained relatively stable during the relevant times alleged herein.  For example, even though DuPont's Titanium Dioxide plant in DeLisle, Mississippi, was shut down by Hurricane Katrina in August 2005, and did not even begin phased-in production until January 2006, DuPont's resulting market share decline in 2005 was recovered in 2006, even in the midst of price increases and increasing demand for Titanium Dioxide in the United States.  Indeed, sales volumes in DuPont's Coatings and Color Technologies segment (of which Titanium Dioxide sales are a part) declined only 3% from 2004 to 2005, while sales revenues were up 3%.

42.     Because Titanium Dioxide is an essential (non-substitutable) element in the production of consumer goods, demand for the product is inelastic:  i.e., the loss in sales volume

from a Titanium Dioxide price increase is small relative to the magnitude of the price increase itself.

43.     The Titanium Dioxide industry in the United States presents strong characteristics favoring creation of an unlawful pricing cartel.  The industry is highly concentrated and involves the sale of a homogenous commodity product, for which there is inelastic demand.  Couple this inelastic demand with the industry's high barriers to entry, and the concomitant opportunity to collude, cooperate, and conspire regarding the pricing for Titanium Dioxide supply and output is particularly likely.  This is especially true given that the vast majority of the world's capacity for production of Titanium Dioxide is concentrated in these few Defendants.  Indeed, the Defendants have taken advantage of this opportunity, to Valspar's detriment.

44.     Titanium Dioxide market characteristics that indicate collusive behavior include coordinated price increase announcements, the existence of joint venture agreements among cartel members, and static or declining demand over time, which incentivizes those in collusion to coordinate supply restraint or reduction and avoid downward price competition.  Moreover, these factors make it easier for each Defendant to monitor one another's compliance with an agreement to artificially inflate or stabilize prices, putting each at a higher risk of retaliatory action and enforcement from those who might choose not to disrupt the unlawful agreement and restraint of trade.

45.     Industries like the Titanium Dioxide industry, with few sellers facing similar costs, low substitutability, competition primarily based on price, and high barriers to entry are particularly susceptible to price collusion.  Succinctly stated, the Titanium Dioxide industry has all of the characteristics of a price-fixing cartel waiting to happen.  This set the stage for an

unlawful conspiracy to manipulate, fix, maintain, and stabilize the price of Titanium Dioxide which began to impact industry pricing on or shortly before 2002.

**C.      Defendants' Unlawful Titanium Dioxide Price Fixing Conspiracy**

>       **a.      Background: History of the Conspiracy.**

46.     The Defendants' joint ventures, transactions, deals, and agreements afforded them opportunities to discuss pricing, capacity, cost, customer, and other nonpublic, commercially sensitive issues.  Defendants engaged in such coordinated pricing activity at least by 2002 and thereafter to further their unlawful and ongoing concerted activity and conspiracy (the "Relevant Period").  In the absence of such a fixed agreement or understanding among Defendants, it would have been contrary to the independent economic self-interest of each Defendant to allow its competitors access to such information.

47.     During the 1990s, on account of factors including global overcapacity and customer consolidation, Titanium Dioxide prices trended downward, with the profitability of Titanium Dioxide manufacturers reaching an all-time low in 1996.  Bayer and Rhone-Poulenc left the industry, selling their Titanium Dioxide businesses to Kerr-McGee (Tronox's predecessor) and Millennium, respectively.

48.     The Titanium Dioxide business of Imperial Chemical Industries also went up for sale, and it was eventually sold to Huntsman.

49.     Although industry consolidation and other factors helped industry prices and margins improve by the year 2000 from their 1996 lows, poor economic conditions following the events of September 11, 2001, declining demand, and increased global customer purchasing power severely eroded prices in 2001.

50.     Demand in 2001 had even decreased to the point that Defendant Millennium idled one of its U.S. plants effective September 1, 2001, informing customers that they would not be impacted because other plants could still supply them.

51.     By the end of 2001, average U.S. prices of Titanium Dioxide purportedly had reached their lowest level in current dollars since 1991.

52.     As a result of abysmal industry conditions in 2001, Defendants were motivated to reach, and did reach, an agreement or understanding in or around 2002 to increase prices and improve margins in the industry.  These increases were announced and implemented despite flat demand, decreasing raw material costs, and excess capacity in the industry.  Defendants' agreement or understanding caused customers to pay higher prices for Titanium Dioxide during the Relevant Period than they would have paid in a competitive market.

53.     Defendants and their affiliates produce and sell raw materials to each other.  For example, Defendant Kronos, Cristal, and their affiliates sell raw materials, such as ilmenite ore, to other Titanium Dioxide producers.  Defendants also engage in other business transactions with each other, which have sometimes included sales of Titanium Dioxide between Defendants (as opposed to selling the product to customers of another Defendant or co-conspirator).  Defendants Huntsman and Kronos have the aforementioned 50/50 Titanium Dioxide manufacturing joint venture, and Kronos and DuPont cross-license patents used to make certain Titanium Dioxide grades.  The mutually beneficial nature of the business relations between Defendants provided not only the opportunity to conspire, but also a financial incentive to do so.

54.     The more that Defendants came to deal with and rely on each other, the more incentivized they were to maintain market stability, to agree on and support price increases and to avoid competing on price for the business of each other's customers.

55.     Defendants' meetings and communications worldwide during the relevant times alleged herein fostered cooperation, eliminated competition, and permitted the unlawful price-fixing conspiracy.

56.     Defendants' conspiracy to overcharge Titanium Dioxide purchasers was monitored and policed by communications not only among Defendants themselves, but also between Defendants and industry consultants, customers, and others.

57.     For example, beginning in May 2004, Defendants were able to monitor each other's conduct both in the United States and worldwide through TZ Minerals International's TiO2 Review, a publication that, during the relevant time period alleged herein, provided Defendants with detailed production, pricing, capacity, raw material, and other information and statistics.  The July 2004 issue of this publication included an article on industry price dynamics written by Robert Louw, Senior Vice President of Huntsman.  (Upon leaving Huntsman, Mr. Louw joined TZ Minerals International as its senior global pigment advisor in or around April 2005.)

58.     Defendants were also able to monitor whether price increases would be followed, or were followed, through conversations with consultants, customers, and others, as well as through public sources like Chemical Week, the Chemical Market Reporter (now ICIS), and Defendants' websites.

59.     For example, in advance of the effective date of a price increase, Defendants routinely sent price increase announcement letters to customers being served by other producers, conditioning the market to accept a price increase by the effective date.  This conduct maximized the transparency in the market of Defendants' collective willingness to increase prices and discouraged price competition or "cheating" on the price increase.

60.     After having reached an unlawful agreement or understanding as alleged herein, Defendants used consultants, customers, and others as conduits to confirm intended pricing and other actions with each other.

> **b.     Titanium Dioxide Manufacturers Association and Other Trade Meetings and Conferences Serve as Conduit for Conspiracy.**

61.     Defendants' cooperative and collusive pricing and supply activities were furthered during meetings and discussions that took place during (or around the time of) trade association functions.

62.     Defendants are all members of the American Chemistry Council's Titanium Dioxide Panel.  Although the timing and frequency of the meetings of the Panel are not fixed, annual American Chemistry Council meetings are held in June at the Greenbrier in White Sulfur Springs, West Virginia, and these were attended by many Defendants.

63.     Defendants are also members of the Titanium Dioxide Manufacturers Association, which conducts annual and other meetings and is associated with the European Chemical Industry Council (a/k/a "CEFIC").  Defendants are also members of the Titanium Dioxide Stewardship Council, which was formed as a U.S. industry trade group focusing on safety, health and environmental issues.  Defendants also met and spoke with each other at bi-annual (odd year) IntertechPira Titanium Dioxide Conferences, and at bi-annual (even year) meetings and exhibitions of the Industrial Minerals International Congress, and other associations related to their industry and customers.

64.     During the relevant times alleged herein, when Defendants met and spoke with each other, they were always in the process of trying to increase Titanium Dioxide prices. Indeed, the facts reveal that Defendants and co-conspirators regularly and routinely met and spoke with each other before price increase announcements; during the period of time after an

industry increase had been announced but before it became effective, and after the effective dates of price increases, when Defendants and co-conspirators were in the process of implementing the increases for all of their customer accounts.

65.     Like their other business meetings, trade association functions provided Defendants with the opportunity to discuss prices and support for price increases, as well as capacity and cost issues.  Defendants engaged in such private discussions with each other at dinner meetings before and during trade association and other business meetings.  Defendants' contacts also fostered industry discipline in maintaining and effectively allocating customer positions and market shares.  The numerous meetings and contacts (both bi-lateral and multi-lateral) between Defendants and co-conspirators typically coincided with simultaneous industry price increase announcements.

66.     For example, a meeting of the Titanium Dioxide Manufacturers Association took place in Finland on or around January 24, 2002.  Immediately following this meeting and in spite of flat demand, decreasing raw material costs, and excess capacity in the industry, Defendants and their co-conspirators announced price increases worldwide, including in the U.S., to be effective March 1, 2002.

67.     Also, the annual Industrial Minerals International Congress Exhibition was held in Paris, France on April 21-24, 2002.  At the time this exhibition was held in Paris, Defendants were still in the process of increasing prices to their customers globally, in part because the largest customers typically buy Titanium Dioxide under contracts that contain price protection clauses, which defer the effective date of an increase until several months after the increase's announcement.

68. The March 2002 price increases also occurred right before the seasonal demand peak period of April to June. The increases were successful, and the Defendants increased prices again in and around July 2002.

69. The Industrial Minerals International Congress Exhibition and other functions and trade shows like it during the Relevant Period that also took place when Defendants were increasing prices provided Defendants with the opportunity to affirm to each other their resolve to increase industry prices. In fact, industry prices increased during the Relevant Period.

70. From February 3-5, 2003, a Titanium Dioxide Conference was held in Miami, Florida. It was attended by Defendants, including DuPont's Global Business Director (Ian Edwards, who gave the keynote address), as well as a former Vice President of Defendant Millennium (Bruce Zwicker), who told conference attendees to expect further price increases. Around the time of this conference, Defendants and their co-conspirators announced a $0.06 per pound price increase for all grades except paper grades sold in North America.

71. A few months later, while Defendants were still trying to increase prices to some customers and shortly after DuPont and other Defendants announced a North American price increase for paper grades (effective April 1, 2003), an Industrial Minerals International Congress Exhibition was held in Montreal, Canada from April 6-9, 2003.

72. At an Industrial Minerals International Congress conference in Barcelona, Spain, held in the last few days of March 2004, a Senior Vice President of Huntsman gave a presentation about Titanium Dioxide industry prices and price dynamics. It was a timely speech because Defendants were in the process of increasing prices to customers at this time. As described in greater detail below, Defendants had announced Titanium Dioxide price increases in North America that became effective March 15, 2004.

73.     From March 2-4, 2005, a Titanium Dioxide Conference was held in Cannes, France.  It was attended by Defendants, including Vice Presidents from Lyondell and DuPont (Sam Severance) who gave keynote presentations.  As described below, Defendants previously increased prices, effective in January 2005, and also announced worldwide price increases within weeks after this conference in March 2005 that became effective April 1, 2005.  Indeed, around this time, Defendants were announcing price increases every quarter.

74.     An Industrial Minerals International Congress Exhibition was held in San Francisco, California, from March 26-29, 2006.  Defendants, who likely attended the Exhibition, were in the process of trying to increase prices at this time.

75.     An Intertech Titanium Dioxide Conference took place in Fort Lauderdale, Florida, from February 12-14, 2007.  It was attended by Defendants, including Vice Presidents from Lyondell and DuPont.

76.     An Industrial Minerals International Congress Exhibition was held in Athens, Greece, from March 30 – April 2, 2008.  Defendants were registered to attend and are believed to have attended.

77.     In addition to prices, costs and customers, Defendants also discussed capacity issues with each other.  Their discussions helped them reach an understanding of the need to restrain Titanium Dioxide capacity expansion, which restraint they knew would help stabilize prices and support price increases despite industry overcapacity.

78.     For example, the July 2004 issue of TZ Minerals International's TiO2 Review stated that the "decision to reduce capacity by both Huntsman Tioxide and Millennium will possibly impact on future price levels."

79.     Indeed, it did, as the industry announced price increases shortly thereafter to be effective in October 2004.  Defendants monitored each other's capacity plans, including plant closures, "debottleneckings" and "brownfield" capacity expansion through the improvement of production efficiencies at existing facilities.

80.     Defendants were aware of each other's inventory levels and operating rates.

81.     Defendants understood that industry expansion needed to occur in a "disciplined" way, e.g., in a manner that sought to eliminate—or at least minimize—the potentially negative pricing impact of capacity expansion.

82.     At times during the Relevant Period, Defendants wanted the industry to appear to be "tight" on product (regardless of whether demand was weak or strong), so that industry overcapacity never caused prices to decline like it did in the mid-1990s.

83.     At an investor conference in September 2005, Lyondell, which owned Millennium and had an estimated 19% of North American capacity at that time, made a presentation noting that there were minimal announced Titanium Dioxide industry capacity additions.  The same presentation included a chart that showed annual industry operating rates and overcapacity.  According to that chart, the industry operating rate averaged approximately 87% in the 2002-2005 period.  Despite this, during the same time period, Defendants were announcing price increases nearly every quarter.

84.     Even when industry leader DuPont announced in November 2005 that it had an agreement with Chinese officials to build a massive 200,000 metric-ton-per-year Titanium Dioxide plant in China, Defendants were still able to increase prices, both in 2005 and in subsequent years, and even at times when demand and consumption were declining in the face of poor economic conditions (e.g., as in 2007-2008).  An industry analyst was quoted as saying in

November 2005 that DuPont's new capacity would have no problem being absorbed by the market when it eventually came online because pigments would remain "tight" in the future.

### c.      History of Price Increases.

85.      Defendants' discussions about capacity issues had their intended effect.  None of the capacity increase announcements made during the Relevant Period, including increases planned by DuPont to cover the industry's annual growth, decreased prices.  For example, within weeks after DuPont's announcement of its intent to build a plant in China, Defendants announced price increases in North America and worldwide.  These price increases were a success.

86.      During the Relevant Period, price increase announcements for sales in the United States or North America were typically in cents per pound for all grades of Titanium Dioxide sold to all customers for all end-use applications, effective on a particular date.  Prices in the United States tended to set a benchmark for prices in other regions worldwide.  Price increases in one region were used by Defendants to justify price increases in other regions.  Indeed, industry price increases often occurred worldwide as regional price increases were announced simultaneously or within a month or two of each other.  For example, North American price increases typically occurred within a month or two of announcements of price increases in Europe, Asia, and other regions.

87.      Defendant DuPont, the world's largest supplier of Titanium Dioxide, which had the largest United States and world Titanium Dioxide market share, typically led industry price increases during the Relevant Period.  Defendants routinely matched the amount and typically the effective date of each other's price increase announcements during the Relevant Period.  Defendants also usually justified price increases on the same grounds, whether in written announcements or in discussions with customers.

88.     Immediately following a meeting of the Titanium Dioxide Manufacturers Association in Finland on or around January 24, 2002, Defendants announced Titanium Dioxide price increases for all grades worldwide, including a $0.05 per pound increase in the U.S. to be effective March 1, 2002.  Defendants communicated with each other directly (bi-laterally and/or multi-laterally) and indirectly (such as through industry analysts, consultants, or others) and reached an understanding or agreement to increase industry prices.  The facts indicate that this understanding or agreement was maintained and fostered throughout the Relevant Period by means of other communications, which led to numerous additional price increases and relatively stable customer positions and market shares.  Defendants' communications were conducted surreptitiously.

89.     After Defendants' announcements of the early 2002 price increases, but several weeks before their effective date of March 1, 2002, a chemical and oil industry news service published an article on February 11, 2002, entitled "TiO2 Producers Seek Large Price Increases As Profitability Hovers Near Break-Even Point."  The article noted that support for the worldwide increases "appears unanimous" and it predicted further increases if demand recovered in the next few months.  The article quoted an industry analyst, James Fisher of IBMA, as stating, "Every producer is hurting.  They all need to get prices up."  The article continued, "Producers concede that buyers may question the increases because of last year's falloff in demand, but they stress that the increases are necessary to rebuild margins."  The article also quoted high-level executives from Defendants DuPont (Ian Edwards, Global Marketing Director for Titanium Dioxide), Millennium (Bruce Zwicker, Vice President of the Global Coatings Business), and Huntsman (Stuart Heyes, Vice President of NAFTA Sales), commenting on industry prices, margins, consumption, and demand.

90.     In the summer of 2002, Defendants announced price increases worldwide again. In the U.S., prices of Titanium Dioxide grades sold to the coatings and plastics industries increased $0.06 per pound, and prices of laminate grades sold to the paper industry increased by $0.08 per pound.  A few months later, in and around September 2002, a U.S. price increase of $0.04 per pound for other grades sold to the paper industry was announced.

91.     Defendants also increased prices in 2003.  For example, Defendants and their co-conspirators announced price increases in North America in January 2003 (for all grades except paper grades, effective February 1, 2003), March 2003 (for paper grades, effective April 1, 2003), and September 2003 (for all grades, effective October 1, 2003).

92.     Even though global demand declined in 2003 and industry capacity utilization was approximately 85% that year, Titanium Dioxide prices still increased.  For example, the North American annual average price per ton of Titanium Dioxide (including cost of goods, insurance, and freight) increased from $1,753 to $1,830 from 2002 to 2003, an increase of 4 %.

93.     Defendants increased prices several times in 2004.  There was a U.S. price increase of $0.05 per pound for all grades effective March 15, 2004.  There were also U.S. increases of $0.04 per pound for all grades effective June 15, 2004 (Millennium, DuPont, Tronox, Huntsman), or July 1, 2004 (Kronos); $0.03 – $0.07 per pound, depending on grade, effective October 1, 2004; and $0.06 per pound for all grades effective January 1, 2005.

94.     The North American annual average price per ton of Titanium Dioxide increased from $1,830 to $1,921 from 2003 to 2004, an increase of 5%.

95.     In an article dated February 28, 2005, after the 2004 Fourth Quarter price increases, an industry analyst was reported to say that he "expects 75-85 percent of the increase

to get implemented by the end of [the first quarter of 2005]" and that he "expects benchmark pricing in the U.S. to be around $1 per pound once the increase goes through."

96.     Defendants increased prices in 2005.  For example, DuPont announced a $0.05 per pound increase for all grades effective April 1, 2005, which was in addition to the $0.06 increase that it had announced in December 2004 that had become effective January 1, 2005. There were also U.S. price increases of $0.04 per pound for all grades, effective July 1, 2005, and for $0.06 per pound, effective October 1, 2005.

97.     The North American annual average price per ton of Titanium Dioxide increased from $1,921 to $2,169 from 2004 to 2005, an increase of 13%.

98.     Defendants again increased prices in 2006.  For example, Defendants and their co-conspirators announced a $0.05 per pound increase for all grades in North America, effective January 1, 2006.  This increase was in addition to the October 1, 2005 increase.  There was also a U.S. price increase of $0.04 per pound for all grades effective June 15, 2006 (DuPont), and July 1, 2006 (Millennium, Tronox, and Kronos).

99.     Even though global industry capacity increased from approximately 4 million tons to 5.3 million tons from 2005 to 2006 and industry operating rates were approximately 87% in 2006, the North American annual average price per ton of Titanium Dioxide increased from approximately $2,169 to $2,273 from 2005 to 2006, an increase of 5%.

100.     Defendants sought price increases for all grades worldwide in 2007, despite weak demand for Titanium Dioxide in some regions due to declining economic conditions and overcapacity in the market.  In the U.S., Defendants and their co-conspirators announced a $0.05 per pound increase effective July 1, 2007, and a $0.06 per pound increase effective October 15, 2007 (or October 17, 2007, in the case of Huntsman).  The increases were for all grades.

101.    Defendants announced price increases worldwide for all grades in 2008 on several occasions and also implemented "energy surcharges" for the first time.  Defendants and their co-conspirators announced a $0.06 per pound price increase for all grades sold in North America, effective January 15, 2008 (or January 18, 2008, in the case of Huntsman), stating that the increase was in addition to the $0.06 per pound increase previously announced that was effective October 15, 2007.

102.    On January 7, 2008, the same day of DuPont's first 2008 price increase announcement, an article published in an industry publication quoted a Titanium Dioxide industry analyst and consultant as stating that Titanium Dioxide prices and margins were expected to increase in 2008.  Tronox's CEO was also quoted in the same article as stating: "Although supply and demand fundamentals support increased prices, since 2004 the TiO2 industry has been largely unsuccessful in its efforts to offset rising costs of various inputs, from energy to process chemicals, through increased prices."  This statement was false and misleading because industry "supply and demand fundamentals" rarely, if ever, explained and supported increased prices during the 2004-2007 time period and because Defendants were at times able to offset increased costs during this period and improve their margins.  There was also overcapacity in the industry and flat or weak demand at times during this period, yet, in uneconomic moves, prices were still increased.  This statement by Tronox's CEO was also false and misleading to the extent that it justified increased prices based solely on "supply and demand fundamentals" in light of Defendants' unlawfully coordinated and sustained campaign to increase industry prices worldwide, as alleged in this Complaint.

103.    On May 23, 2008, Defendant Kronos announced a $0.05 per pound increase for all grades sold in North America to be effective June 15, 2008, as well as a $0.03 per pound

"energy related surcharge" effective June 9, that would be added to all North American invoices for the sale of all Titanium Dioxide products. Kronos stated that the surcharge "represents further implementation of previously announced North American price increases." This was the first time that an "energy surcharge" was announced in the industry.

104.    On Monday, June 2, 2008, DuPont announced that it would increase prices for all grades in all regions, telling customers that they "can expect the rapid implementation of previously announced price increases, additional increases and, in some areas, energy-related surcharges." That same day, DuPont announced a North American price increase of $0.05 per pound, effective June 15, 2008, for all grades, stating that this increase was in addition to the two $0.06 per pound increases in late 2007 and early 2008, which were still "in the process of being implemented." On June 3, 2008, DuPont announced an "energy cost related surcharge" of $0.04 per pound, effective July 1, 2008, for grades of Titanium Dioxide sold in North America to the paper and board industry. DuPont cited the dramatically increased cost of crude oil as an example of an energy cost increase that necessitated the surcharge.

105.    On June 3, 2008, Tronox announced global price increases, stating in its press release that "prices for all TRONOX® titanium dioxide (Ti02) grades sold worldwide will increase by up to 8 percent by July 1." On the same day, June 3, 2008, the Vice President and General Manager of DuPont Titanium Technologies was quoted in a PRNewswire article as saying "We expect to increase the global pricing structure by as much as 8 percent in coming weeks."

106.    On June 4, 2008, Millennium and Tronox announced a $0.05 per pound price increase in North America for all grades. Tronox's increase was effective June 15, 2008, and Millennium's increase was effective July 1, 2008.

107.    Also on June 4, 2008, Huntsman announced "energy related surcharges," including a surcharge of $75 per metric ton for "all sales of imported product into North America."  On June 6, 2008, Huntsman announced price increases throughout the world, and on June 9, 2008, Huntsman matched the other Defendants in announcing a North American price increase of $0.05 per pound effective July 1, 2008.

108.    On June 12, 2008, Millennium announced that it would apply "raw material surcharges" to Titanium Dioxide grades sold into the North American paper market of either $0.04 per pound (for Tiona RCS-P grades) or $0.09 per pound (for sulfate anatase grades).

109.    On June 23, 2008, only three weeks after its June 2, 2008 price increase, DuPont announced another price increase, this time for $0.06 per pound for all grades sold in North America, effective July 1, 2008.  This increase was in addition to all previous increases and the paper surcharge announced earlier in June.

110.    On June 25, 2008, both Kronos and Tronox matched DuPont's $0.06 per pound increase for all grades sold in North America, effective July 1, 2008.  The Tronox announcement stated that the "increase is in addition to the price increases announced in October 2007, January 2008 and on June 4, 2008, and is the next step toward partially offsetting the extraordinary increases in freight, energy, and other input costs that the TiO2 industry has absorbed over the last two years."  Kronos also announced another $0.03 per pound energy surcharge to be added to all North American invoices, effective July 15, 2008, which would be in addition to the surcharge that became effective on June 9, 2008.

111.    On June 27, 2008, Defendant Huntsman matched DuPont's second increase ($0.06 per pound for all grades in North America effective July 1) and also announced another

energy surcharge ($0.03 per pound in North America effective August 1).  These increases were in addition to all previously announced price increases as well as the June 4, 2008 surcharge.

112.    On June 30, 2008, Defendant Millennium joined DuPont and the other Defendants and their co-conspirators, announcing a $0.06 per pound price increase for all grades sold in North America, effective July 1, 2008, which was in addition to its previously announced price increases in North America.

113.    On August 1, 2008, Defendant DuPont announced another energy surcharge, this time for $0.06 per pound on all sales of the Titanium Dioxide grades that it sold to the North American paper and board industry, specifically its Ti-Pure® RPS Vantage® grades. Unconscionably, Millennium and Tronox matched DuPont's surcharge increase.

114.    On August 19, 2008, Huntsman announced a $0.05 per pound increase on ten Titanium Dioxide grades sold in North America, effective September 1, 2008, or as contracts allowed.

115.    On September 2, 2008, DuPont announced a North American price increase, effective that same day, of $0.08 per pound for all Ti-Pure® Titanium Dioxide grades.  Kronos and Tronox matched this increase the next day on September 3, 2008.  Millennium joined it on September 4, 2008, and Huntsman joined it on September 5, 2008.  The Huntsman increase announcement did not clarify whether this increase (which was for all grades) was in addition to the $0.05 per pound price increase for ten grades that it had announced several weeks earlier on August 19, 2008.

116.    The September 2008 price increases were misleadingly justified by DuPont, Millennium, and Huntsman because of cost increases, even though oil prices had fallen far below the record highs that they had reached earlier in the year.  Defendants' 2007-2008 price increases

and energy surcharges also occurred in spite of declining demand in the United States for Titanium Dioxide due to recessionary economic conditions, including declining demand in the paint and construction industries. Titanium Dioxide demand generally had decreased almost 20% from 2000-2008 and more than 25% from 2004-2008.

117.   In short, over the course of approximately 14 weeks, from late May 2008 to early September 2008, Defendants and their co-conspirators uniformly announced three separate Titanium Dioxide price increases and at least two energy surcharges, in spite of declining demand. The prices of ilmenite and ruffle titanium ore, key raw materials for making Titanium Dioxide, also decreased from 2007-2008, further showing a disconnect between the 2008 price increases and their purported justification.

118.   Some of the coordinated price increase announcements of the Defendants and their co-conspirators during the Relevant Period are listed by effective date in the following table:

Examples of Certain U.S. TiO2
Industry Price Increase Announcements by
Effective Date in Cent Per Pound

| Effective Date | Dupont | Millennium | Kronos | Tronox | Huntsman |
|---|---|---|---|---|---|
| 03/2002 | $0.05 | $0.05 | $0.03 | $0.05 | $0.05 |
| 08/2002 | | | | $0.06 | |
| 10/2002 | $0.04 | $0.04 | | | |
| 02/2003 | $0.06 | $0.06 | | $0.06 | |
| 10/2003 | $0.06 | $0.06 | $0.03 | $0.06 | |
| 03/2004 | $0.05 | $0.05 | $0.05 | | |
| 04/2004 | | | | | $0.05 |
| 06/2004 | $0.04 | $0.04 | | $0.04 | $0.04 |
| 07/2004 | | | $0.04 | | |
| 10/2004 | $0.06 | $0.06 | $0.06 | $0.06 | $0.06 |
| 01/2005 | $0.06 | $0.06 | $0.06 | | |
| 04/2005 | $0.05 | $0.07 | $0.05 | $0.05 | |

| 07/2005 | $0.04 | $0.04 | $0.04 | $0.04 | |
| 10/2005 | $0.06 | $0.06 | $0.06 | | $0.06 |
| 01/2006 | $0.05 | $0.06 | $0.05 | $0.05 | $0.05 |
| 06/2006 | $0.04 | | | | |
| 07/2006 | | $0.04 | $0.04 | $0.04 | |
| 08/2006 | | | | | $0.04 |
| 10/2006 | $0.04 | | | | |
| 07/2007 | $0.05 | $0.05 | $0.05 | $0.05 | $0.05 |
| 10/2007 | $0.06 | $0.06 | $0.06 | $0.06 | $0.06 |
| 11/2007 | | $0.06 | | | |
| 01/2008 | | $0.06 | $0.06 | $0.06 | $0.06 |
| 06/2008 | $0.05 | | $0.05 | $0.05 | |
| 07/2008 | $0.06 | $0.05 | $0.06 | $0.06 | $0.05 |
| 08/2008 | | | | | $0.06 |
| 09/2008 | $0.08 | $0.08 | $0.08 | $0.08 | $0.08 |
| 01/2009 | $0.04 | | | | |
| 06/2009 | | | $0.04 | | |
| 08/2009 | $0.02 | $0.02, $0.03 | $0.03 | $0.02 | $0.02, $0.03 |
| 10/2009 | $0.05 | $0.05 | $0.05 | $0.05 | $0.05 |
| 01/2010 | $0.06 | $0.06 | $0.06 | $0.06 | $0.06 |
| 04/2010 | $0.05 | $0.05 | $0.05 | $0.05 | $0.05 |
| 06/2010 | $0.08 | $0.08 | $0.08 | $0.08 | $0.08 |
| 09/2010 | | $0.08 | | $0.08 | $0.08 |
| 10/2010 | $0.08 | | $0.08 | $0.08 | |
| 01/2011 | $0.10 | $0.10 | $0.10 | $0.10 | $0.08 |
| 04/2011 | $0.15 | $0.15 | $0.15 | $0.15 | $0.15 |
| 06/2011 | $0.10 | $0.10 | | $0.10 | $0.20 |
| 07/2011 | $0.25 | $0.25 | $0.35 | $0.25 | $0.15 |
| 08/2011 | $0.10 | | $0.10 | | |
| 09/2011 | $0.32 | $0.10 | $0.10 | $0.10 | $0.10 |
| 10/2011 | | | $0.25 | | |
| 11/2011 | $0.15 | $0.15 | | $0.15 | $0.15 |

<u>Sources</u>:  Defendants' press releases; 2002-2008 *Chemical Market Reporter, Chemical Week*, and other industry news articles.

119.  All these acts indicate that Defendants unconscionably reached an unlawful agreement or understanding to fix, raise, maintain, and stabilize Titanium Dioxide prices during the Relevant Period.  Pursuant to the alleged conspiracy, Defendants and their co-conspirators engaged in deceptive behavior including secret discussions about industry pricing, capacity,

costs, and customers, and conspired and agreed to support industry price increase announcements.  Price increase announcements were routinely supported in the industry during the Relevant Period, and this consistent conduct in light of Defendants' considerable contacts with each other further supports an anticompetitive understanding or agreement exists among Defendants during the Relevant Period.

120.    The conspiracy among Defendants was successful in unfairly increasing prices during the Relevant Period, even when industry overcapacity and weak demand existed.  For example, in November 2007, Defendant Millennium announced that it was closing a Titanium Dioxide plant in France, in part due to industry overcapacity.  As discussed above, Defendants announced worldwide price increases in 2007 and in 2008.  Unlike in the 1990s, when market forces caused industry overcapacity to generate lower prices and poor industry margins, Defendants' conspiracy managed to prevent overcapacity from appreciably impacting prices during the Relevant Period.

121.    Defendants' price increases during the Relevant Period had their intended effect, and the alleged conspiracy has been profitable for Defendants.  For example, the average annual price per ton of Titanium Dioxide in North America increased from approximately $1,753 in 2002 to $2,273 in 2006, an increase of 30%.  Defendants Huntsman and Kronos dramatically increased their operating income and margins between 2002 and 2003.  Even after discounting the $142 million in insurance proceeds that Defendant DuPont received for damages to its Mississippi plant from Hurricane Katrina in 2005, DuPont's operating income for its Coatings & Color Technologies segment (which includes its Titanium Dioxide business) increased approximately 45% from 2002 to 2007.  In addition, in 2008 and in spite of declining demand for Titanium Dioxide and recessionary economic conditions in the United States and elsewhere, the

global Titanium Dioxide industry earned more than $1 billion in pre-tax operating income. Industry leader and Defendant DuPont achieved approximately half of that amount.

**D.    Increased Interfirm Communications**

122.    During the Relevant Period, communications between and among the Defendants and their co-conspirators signaled to each other their intent to increase price and the sharing of firm-specific titanium dioxide information with competitors and industry consultants, especially Jim Fisher.

123.    Around the time of a TDMA General Committee meeting held in Brussels on September 27, 2001, Millennium produced a "Strategic Planning Presentation" and included a slide titled "TiO2 Industry Trends."  The list of "Trends" included "[p]ossibly more discipline on pricing and capacity."

124.    On April 17, 2002, David Vercollone of Millennium wrote to his colleagues at Millennium that the TDMA's Global Statistics Program was "an important effort for us to get the industry to make more informed decisions" and "the best opportunity we have in structuring industry data for all our collective needs."  Vercollone's uses of "we" and "our" indicate he was speaking about the benefits of the Global Statistics Program to the members of the TDMA, not just Millennium.

125.    At an industry-wide conference in Miami, Florida, in February 2003, Millennium's former Vice President of Global Coatings Bruce Zwicker gave a presentation in which a slide referred to possible industry "tightness" in the future.  Ian Edwards, DuPont's Global Business Director for titanium dioxide, also presented at the conference.  Subsequently, Edwards explained in an e-mail to others at DuPont that his "goal at the time had been to stress the need for the industry to get its' [sic] financial house in order."  Edwards added that the

"written version," which he attached to the e-mail, "is fairly cautious in how [he] said that—verbally at the conference [he] was more direct."

126.     Millennium's John Hall sent an e-mail on December 14, 2007, to his colleague Jim Clover and others at Millennium regarding the need to "improve price."  Hall recommended that Millennium "[b]e disciplined, keep [its] volume, do not take others."

127.     Defendants also engaged in communications reflecting coordinated price increase announcements, with a goal of stabilizing market share.  For example, on January 7, 2002, Dave Young of DuPont sent an e-mail to his colleagues regarding a "Price Increase Initiative."  Under the heading "Timing," Young described two alternatives.  The first was to announce the price increase on "February 4, effective March 1."  The second alternative involved a price increase announcement on "January 25, effective February 15."  The latter option, Young wrote, "could give our competitors a change [sic] to announce 'differently' on March 1."

128.     On June 14, 2002, Connie Hubbard, DuPont's Competitive Intelligence Manager, drafted an entry in DuPont's "Competitive Intelligence" database regarding a discussion she had with industry consultant Jim Fisher on June 7, 2002, several days before DuPont's June 11, 2002 price increase announcement.  In the entry, Hubbard noted that Jim Fisher had called her to confirm that Huntsman had announced a "$150/T increase" in North America. Hubbard noted that "[a]s this call came before the DuPont announcement, [she] told [Fisher] that [she] had not seen any press release or announcement on Huntsman (or DuPont) and asked him his source."

129.     On May 5, 2003, Millennium's Gary Cianfichi sent an e-mail to colleagues at Millennium and included the first quarterly end use data from the new Global Statistics Program.  Cianfichi set out "what we can and can not do" with the statistical data.  He explained that the statistics could not be copied or given to anyone without his approval, as they had "a high level

of very confidential information in them that we do not want others to see.  Others include both internal [Millennium] people at any level, customers, journalists, outside consultants, vendors trade groups etc."  Cianfichi emphasized, "We do not want anyone even referring to the existence of this type of data to any other parties."  Later in the e-mail, Cianfichi explained that any references made to the public regarding market details should be described as "[Millennium] estimates and never as CEFIC data."

130.     On August 25, 2004, Millennium's European sales director Tim Edwards sent an e-mail to Gary Cianfichi, regarding a draft price increase announcement.  Edwards suggested that the October 1 announcement date was "a bit early," while an announcement on November 1 would give "others [a] chance to get on their horses."

131.     On September 13, 2004, Bob Lee, Millennium's Chief Executive Officer, as well as Millennium's Deputy General Counsel and Director of Corporate Development, met with Tom Keenan, the President of Huntsman, and Mahomed Maiter, Huntsman's Vice President, in Baltimore, Maryland. The next day, Millennium's Gary Cianfichi sent an e-mail to colleagues, stating "now that we have competition on board for the Oct 1 price increase announcement, please relook at your agents['] commissions."

132.     DuPont's DeLisle Plant in southern Mississippi was shut down due to Hurricane Katrina in August 2005.  In November 2005, Tronox's Vice President of Investor Relations, Robert Gibney, sent an e-mail to colleagues about DuPont's strategy regarding the DeLisle Plant. According to a report by financial firm JP Morgan, the head of DuPont's coating division stated that DuPont would "bring DeLisle up gradually and NOT flood the market with product." Gibney also wrote that DuPont would not be "aggressively pursuing their lost share and will be diligent in bringing the volume back to the market."

133.    On June 16, 2006, DuPont's Ian Edwards sent an e-mail to colleagues at DuPont regarding price increases announced by Millennium and Huntsman on the previous day.  "The timing may be no coincidence," Edwards explained, because "their reading of the CEFIC info like ours should give them confidence that [North America] price increases can be prosecuted despite the flat market in [North America] itself."  That same day, Connie Hubbard of DuPont forwarded a Kronos price increase announcement to Edwards, copying other colleagues and stating, "Ian, Looks like John's leadership woke up the majors and the May CEFIC data gave them some conviction."

134.    On July 9, 2007, Michael Card of Millennium sent an e-mail to colleagues with the subject line "2008 Sales Plan." Card wrote that Millennium's market share was 20 percent in the year to date, while the company's historical share was 21 percent.  Regarding the market share that Millennium was "not getting," Card stated, "[w]e should have this extra share—customers have been and want to buy this from us.  Competitors will let us have this."

135.    On or about November 21, 2007, Millennium's Jim Clover made a handwritten notation reading, "Don't steal Dup tonnes."

136.    Huntsman's Mike Quinn sent an e-mail to colleagues on June 3, 2008, with the subject line "Pricing Posture."  Quinn explained, "There is strong evidence that pricing of TiO2 in plastics markets will increase effective June 1. . . . Our position at this time is that we support implementing a 3 cpp price increase this month . . . but will defer to the market competitives brought forth by the larger TiO2 suppliers."  "Remember," Quinn added, "we can't lead a price increase but we sure can kill it; and we won't be left behind if others push the pricing up."

137.    On September 2, 2008, DuPont announced a price increase to be effective immediately.  The next day, Millennium's Manager of Global Corporate Communications "made

some changes" to its draft announcement in which it would be matching DuPont's price increase, because the draft was "too much like DuPont's."

138.    On December 4, 2008, Joe Maas of Kronos sent an e-mail to his colleagues about Kronos's November 2008 sales.  Mass wrote that the company's sales volume "was the lowest November volume since 1998 and the worst sales volume month since December 2003!"  The "good news," Maas explained, was that Kronos's "average price worldwide increase[d] by 17 US$/MT and we have now realized since May a total average price increase of 205 US$/MT." He concluded, "[i]t appears that we and our competitors are prepared to reduce production rather than chase phantom volume."

139.    In March 2009, Richard C. Olson, vice president and general manager of Defendant DuPont's Titanium Technologies gave the key note address at IntertechPera's TiO2 2009 conference.  According to DuPont's website, Mr. Olson "said during the economic downturn the titanium dioxide industry must operate more cautiously, keeping inventory at levels only sufficient to satisfy customer requirements, scrutinizing all capital expenditures and avoiding investment in new capacity without some certainty of a reasonable return." Representatives from Millennium also presented at this conference, and upon information and belief, Defendants and their co-conspirators were able to meet and discuss price increases at or around the time of the conference.

140.    Following the IntertechPera's TiO2 2009 conference, Defendant DuPont announced a price increase on May 15, Millennium announced an increase on May 20, Kronos announced an increase on July 10, Huntsman announced a price increase on July 15, and Tronox announced a price increase on July 17, each with an effective date of August 1, 2009.  DuPont,

Millennium, and Huntsman each increased their prices by $0.02 per pound, and Kronos and

Tronox increased their prices by $0.03 per pound.

141.    TZMI played host to another minerals conference in October 2009.  David Robb,

then Managing Director of Iluka Resources (an Australian minerals company), stated in his

opening address, "Industry participants who seek temporary advantage or cash flow through

lowering prices in the face of weak demand are confining themselves and the industry to a long

and painful recovery process.  Of course, we recognize that individual companies will act in

what they believe is their own interest, but often that just produces short term gain and long term

pain."  Upon information and belief, representatives from DuPont on Millennium were both in

attendance at the conference and were able to meet and discuss price increases at or around the

time of the conference.

142.    On December 2, 2009, Kronos's Maas e-mailed a file entitled "R&D Org Chart"

to Fisher on December 2, 2009, and warned Fisher, "[P]lease do not copy it verbatum [sic] and

screw up a few facts so it does not look like too much inside info."  Defendants Kronos and

Millennium and co-conspirator Tronox simultaneously announced a price increase of $0.06 per

pound one week later, effective January 1, 2010.  Huntsman followed suit with an immediate

$0.06 per pound increase on January 14, 2010.

143.    Defendants and their co-conspirators followed up on the January 2010 price

increase with a second $0.05 per pound increase, effective April 1, 2010.  DuPont led this

increase on February 24, and Kronos, Huntsman, Tronox, and Millennium followed on March 3,

9, 10, and 12 respectively.

144.    The 20th Industrial Minerals International Congress & Exhibition was held later

in March 2010.  It is believed and alleged that DuPont and Millennium were in attendance and

that Defendants and their co-conspirators were able to meet and discuss price increases at or around the same time. One month after the conference convened, Defendants and their conspirators announced a third 2010 price increase of $0.08 per pound, effective June 1, 2010. DuPont again led the charge on April 30, and Millennium, Kronos, Huntsman, and Tronox followed on May 3, 5, 6 and 17 respectively.

145.     On September 2, 2010, Millennium's Dave Murrer sent an e-mail to his colleagues with the subject line, "DuPont Price increase – North America +$0.08 Oct 1." His e-mail was responding to a colleague's statement about a Huntsman price increase announced on August 24, 2010. This was the first time in the North American market that Huntsman initiated a price increase, and each Defendant followed it, though with different amounts and dates on which the increases would become effective. The colleague wrote, "Wow – we now have different dates and amounts from all 3 that have announced. . . . I am not sure what our position will be or legal implications, but I would stick with our date and amount." The email also said "A key learning from this is we should have waited to announce."

146.     TMZI held its Annual Asia in Focus Congress in Hong Kong from November 3-5, 2010. A DuPont representative spoke at the conference, and it is believed and alleged that Defendants and co-conspirators in attendance were able to meet and discuss price increases at or around the same time. One week later, Huntsman announced an $0.08 per pound increase. Kronos, Millennium, Tronox, and DuPont followed with $0.10 per pound price increase announcements on November 15, 24, and 30 and December 3, respectively.

147.     Defendants also exchanged communications with industry consultant Jim Fisher in which sensitive information was exchanged or the Defendants acknowledged Fisher's role in

sharing industry information. Jim Fisher acted as an information conduit, helping to facilitate the alleged price-fixing conspiracy.

148.    For example, on May 23, 2002, Joe Maas of Kronos sent an e-mail to Jim Fisher noting that his family was looking forward to their vacation at Fisher's new home.  Maas also mentioned "on a business note" that he had heard Huntsman announced a price increase of "150$/mt???!!!"  "It sounds weird to me," wrote Maas, "[c]an you confirm anything from your lofty position??"

149.    On July 31, 2003, Gary Cianfichi of Millennium sent an e-mail to his colleagues John Hall and Rick Rowe with the subject line "US TiO2 stats."  In the e-mail, Cianfichi primarily reported that Millennium had decided to "stop our US TiO2 statistics reporting to the [Department of Commerce]" in order "not to telegraph a possible US TiO2 inventory buildup by us and others."  He concluded the email, "PS – John – also note that Bob asked me to talk to Fisher to ask him to do a little job for us – ascertain relative TiO2 inventory levels for some of our key competitors.  A little task but I'll speak to Jim this week on this."

150.    In March 2005, the pigment producers, including at least some of the Defendants, attended an industry-wide conference in Cannes, France.  Jim Fisher later wrote, in the context of an expert report for unrelated litigation, that at the conference, the pigment producers "discussed the need to take advantage of tight market conditions to improve pricing."  Fisher's report went on to mention that John Hall of Millennium "noted in his presentation that the industry should avoid responding to increased demand with 'over-investment in capacity' as had happened in the past."

151.    On August 29, 2007, Connie Hubbard of DuPont drafted an entry in DuPont's Competitive Intelligence database with the subject line "Comments from Jim Fisher."  Hubbard

noted that Fisher had told her, regarding "pricing," he was "[v]ery confident that Tronox, Kronos, and Huntsman will follow."

152.    On December 2, 2009, Joe Maas of Kronos sent an e-mail to Jim Fisher and attached what Maas titled an "R&D Org Chart."  Although Gary Cianfichi of Millennium is not mentioned in the e-mail's header, the chart came from Cianfichi's files.  In the body of the e-mail, Maas wrote to Fisher, "please do not copy it verbatum [sic] and screw up a few facts so it does not look like too much inside info."

**E.    Interfirm Sales of Titanium Dioxide**

153.    Defendants discussed, and in some case agreed to, interfirm sales of titanium dioxide, as well as entered into joint ventures and swapped raw materials.

154.    One example is the joint venture between Huntsman and Kronos, the Louisiana Pigment Company.  In a January 2002 monthly report produced by Huntsman, the firm noted the financial performance of the Louisiana Pigment Company.  The report included that the joint venture's production declined to "9082 te, the reduced rate being a result of the JV partner wishes due to high Y/E stocks."

155.    Another example is a series of transactions between Millennium and DuPont in early 2007, in which Millennium purchased titanium dioxide from DuPont.  Millennium paid a price of eighty-eight cents per pound for DuPont's product, while the lowest price paid by any other purchaser in January 2007 was nine cents higher.  The average price paid by other purchasers during this time period was nineteen cents higher per pound than the price charged to Millennium.  Instead of competing for Millennium's customers, DuPont appears to have provided help to Millennium, selling titanium dioxide at a rate lower than that on the market.

156.    In December 2008 -- during the economic recession -- Millennium's John Hall wrote an email to a colleague in Saudi Arabia, with the subject line "A concept – 'Co-

opertition.'"  In the e-mail, Hall introduced a possibly "crazy idea . . . perhaps worthy of some consideration" because of the "very difficult times."  He proposed that Millennium consider consolidating "production with a competitor in order to increase rates and reduce cost for similar product in the market."

## F.     Valspar Suffered Antitrust Injury

157.    Defendants' combination and conspiracy has had the following effects, among others:

> a.      Price competition in the sale of Titanium Dioxide by Defendants and their co-conspirators has been restrained, suppressed, and eliminated throughout the United States;
>
> b.      Prices for Titanium Dioxide sold by Defendants and their co-conspirators have been unfairly raised, fixed, maintained, and stabilized at artificially high and noncompetitive levels throughout the United States; and
>
> c.      Defendants charged Valspar inflated, fixed, and stabilized prices for such Titanium Dioxide.

158.    During the Relevant Period, Valspar paid supra competitive prices for Titanium Dioxide.

159.    By reason of their illegal, unfair, and anticompetitive conduct, Valspar has sustained injury to its businesses and/or property, having paid higher prices for Titanium Dioxide than it would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and, as a result, has suffered damages in an amount presently undetermined.

160.    Valspar has suffered an antitrust injury of the type that the various federal and Minnesota laws invoked by this Complaint were meant to punish and prevent.

**G.      Valspar's Claims Are Not Barred By the Statute of Limitations**

161.    Valspar's claims have been tolled since the filing the direct purchasers' class action complaint initiated on February 9, 2010, by Haley Paint Company captioned *Haley Paint Co. v. E.I. DuPont de Nemous and Co., et al.*, 1:10-cv-00318 RDB, and venued in the United States District Court for the District of Maryland (the "Direct Class Action").

162.    Valspar had no knowledge of the combination or conspiracy alleged in this Complaint, or of facts sufficient to place them on inquiry notice of the claims set forth in this Complaint, at least until it learned of the Direct Class Action.

163.    Consequently, the statute of limitations as to Valspar's claims did not begin to run, and has been tolled with respect to the claims that Valspar has alleged in this Complaint.

**H.      Fraudulent Concealment Tolled the Statute of Limitations**

164.    In the alternative, application of the doctrine of fraudulent concealment tolled the statute of limitations on the claims Valspar asserts in this Complaint.

165.    Because Defendants' agreements, understandings and conspiracies were kept secret and not known to Valspar at least until it learned of the Direct Class Action, Valspar, before that time, was unaware of Defendants' unlawful conduct, and it did not know before then that it was paying supracompetitive prices throughout the United States for Titanium Dioxide during the Relevant Period.

166.    The affirmative acts of the Defendants alleged in this Complaint, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

167.    By its very nature, Defendants' and their co-conspirators' price-fixing conspiracy was inherently self-concealing.  Valspar thus had neither actual nor constructive knowledge of the facts constituting its claims for relief despite diligence in trying to discover the pertinent

facts.  Valspar did not discover, and could not have discovered through the exercise of reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws, at least until it learned of the Direct Class Action.  Nor could Valspar have discovered the alleged violations earlier than that time because Defendants and their co-conspirators are alleged to have affirmatively concealed their conspiracy by meeting secretly to discuss Titanium Dioxide prices, customers and markets; by agreeing among themselves at meetings and in communications not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme; by deceptively giving false and pretextual reasons for price increases, and by describing Titanium Dioxide pricing falsely as being the result of competitive factors rather than collusion; and by wrongfully and fraudulently concealing their collusive activities through various other means and methods designed to avoid detection.

168.    Without the benefit of discovery, it is impossible to determine the scope and extent of Defendants' and their co-conspirators' (non-public) meetings and communications with each other.  Defendants are alleged to have engaged in a secret conspiracy that necessarily did not give rise to facts that would put Valspar on inquiry notice that there was a conspiracy to fix prices for Titanium Dioxide.  As explained above, it was not until at least the time that Valspar learned of the Direct Class Action that Valspar learned that it had suffered damages as a result of the illicit artifice underlying this Complaint.

169.    Because Defendants' agreements, understandings and conspiracies were kept secret and not known to Valspar until at least the time that Valspar learned of the Direct Class Action, Valspar, before that time, was unaware of Defendants' unlawful conduct, and did not

know before then that it was paying supracompetitive prices, throughout the United States for
Titanium Dioxide during the Relevant Period.

170.    The affirmative acts of Defendants alleged herein, including acts in furtherance of
the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

171.    Defendants took steps to conceal their collusion in their coordinated price
announcements.  For example, on February 23, 2005, Millennium's Gary Cianfichi drafted a
memorandum regarding the company's "price announcement process."  The primary subjects of
the memorandum were the methods of issuing price increase announcements in the "Internet
age" and the "[c]ompetitive landscape" in the titanium dioxide industry.  The memorandum
concluded with two lists titled, "What [Millennium] wants to do" and "What we do not do."  The
first item on the second list read, "No colluding, no history of colluding—we are professional
and know the requirements."

172.    Likewise, on May 22, 2008, DuPont's Ian Edwards sent an e-mail to his colleague
John Gallagher with the subject line, "reactions to R&H surcharge, and our plan for coatings
price?"  In the e-mail, Edwards acknowledged a plan for price signaling and observed "we
cannot get exposed to any interpretation of our price increase announcements as being price
signaling."

173.    On May 29, 2008, DuPont's Peter O'Sullivan sent an e-mail to colleagues at
DuPont about a global price increase that would be announced shortly before an American
Coatings Show in Charlotte, North Carolina.  "Tomorrow we will issue a global price increase
announcement," O'Sullivan wrote, and "[m]aking public announcements in close proximity to a
large industry gathering requires heightened awareness to the inappropriateness of interactions
with competitors."  "I know we are always mindful of the perception any dialogue with

competitors can leave with others, but please be certain next week to refrain from any dialogue with any competitors."

174.    Around the same time, Millennium modeled some of its price increase announcements off of the announcements of other pigment producers.  On June 25, 2008, Millennium's Manager of Global Corporate Communications explained to colleague Jim Clover that Millennium should not use DuPont's language when drafting its own announcements.  "I know we have the [DuPont] announcement there as a reference," the manager wrote, "but as a practice we shouldn't do that even in draft form."

175.    Kronos's Henry Basson passed along to Kronos colleagues an e-mail from Gary Cianfichi at Millennium about the confidential nature of the Global Statistics Program.  Basson wrote, "Any TDMA statistics that are shared with you or any specifics which you may share with your co-workers, should UNDER NO CIRCUMSTANCES BE DIVULGED TO ANY THIRD PARTIES as this information is Confidential to the TDMA members."  Likewise, the Defendants made statements suggesting the Global Statistics Program's influence on the pricing decisions of the Defendants.

176.    Valspar could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their conspiracy.  The conspiracy as herein alleged was fraudulently concealed by Defendants by various means and methods, including but not limited to secret meetings, communications and agreements.  If they were memorialized in records at all, Defendants' contacts and meetings with each other were memorialized in a false and/or misleading manner in order to conceal the anticompetitive topics of discussion.

177.     As alleged above, in 2002 after years of declining prices, the price of Titanium Dioxide began to increase.  The price increases and "surcharges" implemented by Defendants and their co-conspirators during the Relevant Period tended to be based on a need to improve margins, justify future investment, offset increased costs and/or meet allegedly increased demand at a time of tight supply.  The justifications offered by Defendants and their co-conspirators for their price increases were false, pretextual and/or misleading and operated to conceal the conspiracy.  In fact, price increases were the result of collusive conduct among the Defendants and their co-conspirators, which was undisclosed at the time of the increases.  To the extent there was any truth in the explanations offered by Defendants for their numerous price increases during the Relevant Period, the explanations were nevertheless misleading because of Defendants' conspiracy, which was kept secret from the public.

178.     For example, in early 2002 when industry prices had hit bottom and Titanium Dioxide producers were desperate to increase prices, they offered a variety of justifications for price increases.  Huntsman's Vice President of NAFTA sales was quoted in an article as saying that "recent pricing has been insufficient to justify investments in major new capacity, which will be needed by 2003 to 2004, leading to a tight market at that time."  But this was false and misleading because new capacity was in fact not needed. Huntsman and other producers, who successfully increased prices in 2002-2005, actually shut down some capacity during the 2003-2004 period.

179.     Indeed, a lack of new capacity was used at times to justify price increases during the Relevant Period, even though Defendants and their co-conspirators often had more than enough capacity (and inventory) on hand to supply global markets.  For example, Huntsman and Millennium decreased capacity at certain plants in 2004, and shortly after the October 2007 price

increase, Defendant Millennium closed a plant in France citing "the over capacity of titanium dioxide in the world market," among other reasons.

180.    Often during the Relevant Period, Defendants justified the need for price increases due to poor or otherwise "unacceptable" industry margins even though the Titanium Dioxide business of DuPont and other Defendants earned hundreds of millions of dollars in profits annually.  For example, in August 2007, DuPont informed customers (even customers who were being supplied by other Defendants) that price increases were justified in part because industry profitability had declined, even though DuPont's operating income for its Coatings & Color Technologies segment (which includes its Titanium Dioxide business) increased approximately 45% from 2002 to 2007.  Also, in 2008, a year in which the paint and plastics industries (which account for approximately 80% of Titanium Dioxide consumption) were beleaguered by recession, DuPont, the industry leader, earned over $500 million in pre-tax operating income from global Titanium Dioxide sales.

181.    In addition, when DuPont led an industry price increase in September 2008, its price increase announcement contained various justifications for the increase from its Global Business Director, Ian Edwards.  The justifications included not only the existence of higher raw material, energy and transportation costs (which plagued a vast number of industries in 2008), but also the purported fact that "Demand for TiO2 remains strong."  This was false and misleading, as demand for Titanium Dioxide was declining in 2008, particularly given recessionary economic conditions in the paint, construction, paper and plastic industries.  In fact, demand for Titanium Dioxide had been declining for years.  For example, the market volume of Titanium Dioxide sold in the U.S. declined over 25% between 2004-2007.

182.     Although Defendants' price increase announcements during the Relevant Period often did not contain justifications for price increases (such justifications were typically given to customers orally), the announcements nevertheless constituted implicit statements that the price increases in question were legitimate and were the result of competitive market forces. Customers also were often told that price increases were needed because raw material costs were increasing and industry margins were being adversely impacted.  For example, after Defendants announced price increases to be effective on October 1, 2004, an article published in Paint and Coatings Industry magazine on October 1, 2004, stated:  "Dupont said the price increases are the result of rising raw-material costs, economic expansions that are driving 'very strong global TiO2 demand,' high capacity rates, and 'reinvestment economics for capital funding to support industry growth.'"  Similar statements were issued by other suppliers.  Huntsman Tioxide said the price hikes "reflect both strong global market demand and the significant impact of raw material, energy and freight cost increases."  These statements were false and misleading because (1) capacity was not "high"—the industry operating rate averaged approximately 87% in the 2002-2004 period and (2) ore costs, which are a substantial part of the raw material costs of manufacturing Titanium Dioxide, were either decreasing (ilmenite ore) or stable (rutile ore) during the 2002-2004 period.

183.     Defendants' customers, including Valspar, were thus conditioned by experience in dealing with Defendants in what they believed to be a competitive industry to expect price increases from time to time.  Valspar was lulled into believing that price increases were the normal result of competitive market forces rather than the product of collusive, unlawful efforts. Indeed, as alleged herein, Defendants and their co-conspirators made statements in the media in

support of price increases that were presumed to be true and were designed to convince Titanium Dioxide purchasers to pay purportedly legitimate price increases.

184.    Defendants' reasons for the price increases of Titanium Dioxide during the Relevant Period were materially false and/or misleading and were made, at least in part, in order to conceal Defendants' anticompetitive scheme as alleged in this Complaint.

185.    As a result of Defendants' fraudulent concealment of their conspiracy, described in paragraphs 164-184 as well as all other paragraphs of this Complaint, the running of any statute of limitations has been tolled with respect to any claims that Valspar has as a result of the anticompetitive conduct alleged in this complaint.

## CLAIMS FOR RELIEF

## COUNT I

### [Violation of 15 U.S.C. § 1]

186.    Valspar incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

187.    Beginning at least as early as 2002, the exact date being unknown to Valspar, and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

188.    In particular, Defendants and their co-conspirators have combined and conspired to raise, fix, maintain, or stabilize the prices of Titanium Dioxide sold in the United States and elsewhere.

189.   As a result of Defendants' and their co-conspirators' unlawful conduct, prices for Titanium Dioxide were raised, fixed, maintained, and stabilized in the United States and elsewhere.

190.   The combination or conspiracy among Defendants consisted of a continuing agreement, understanding and concerted action among Defendants and their co-conspirators.

191.   For purposes of formulating and effectuating their combination or conspiracy, Defendants and their co-conspirators did those things they combined or conspired to do, including:

   a.   Participating in meetings and conversation to discuss the prices and supply of Titanium Dioxide;

   b.   Communicating in writing and orally to fix prices;

   c.   Agreeing to manipulate the prices and supply of Titanium Dioxide sold in the United States and elsewhere, and to allocate customers of such products, in a manner that deprived direct purchasers of free and open competition;

   d.   Issuing price announcements and price quotations in accordance with the agreements reached;

   e.   Selling Titanium Dioxide to customers in the United States and elsewhere at noncompetitive prices; and

   f.   Providing false and/or misleading statements to the public to explain price increases for Titanium Dioxide.

192.   As a result of Defendants and their co-conspirators' unlawful conduct, Valspar has been injured in its business and property in that it has paid more for Titanium Dioxide than it otherwise would have paid in the absence of Defendant's unlawful conduct.  As a result of

Defendants' antitrust violations, Valspar has been damaged in an amount to be determined at trial.  Valspar also seeks treble damages and the costs of suit, including reasonable attorneys' fees.

## COUNT II

### [Violation of Minnesota Statutes §§ 325D.49, et seq.]

193.     Valspar incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

194.     From as early as 2002, Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of Titanium Dioxide in unreasonable restraint of trade and commerce.

195.     The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supracompetitive levels the price for Titanium Dioxide and to allocate customers for Titanium Dioxide in the United States and elsewhere.

196.     For purposes of formulating and effectuating their combination or conspiracy, Defendants and their co-conspirators did those things they combined or conspired to do, including:

      a.     Participating in meetings and conversation to discuss the prices and supply of Titanium Dioxide;

      b.     Communicating in writing and orally to fix prices;

      c.     Agreeing to manipulate the prices and supply of Titanium Dioxide sold in the United States and elsewhere, and to allocate customers of such products, in a manner that deprived direct purchasers of free and open competition;

      d.      Issuing price announcements and price quotations in accordance with the agreements reached;

      e.      Selling Titanium Dioxide to customers in the United States and elsewhere at noncompetitive prices; and

      f.      Providing false and/or misleading statements to the public to explain price increases for Titanium Dioxide.

197.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and the allocate customers with respect to Titanium Dioxide.

198.    Defendants' anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of Minnesota Statutes §§ 325D.49, et seq.  During the Relevant Period, Defendants' illegal conduct substantially affected Minnesota commerce.

199.    Defendants' combinations or conspiracies had the following effects:  (1) Titanium Dioxide price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Titanium Dioxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) Valspar was deprived of free and open competition; and (4) Valspar paid supracompetitive, artificially inflated prices for Titanium Dioxide.

200.    Valspar has been injured in its business and property by reason of Defendants' unlawful combination, contract, conspiracy, and agreement.  Valspar purchased Titanium Dioxide directly from Defendants.  Valspar paid more for Titanium Dioxide than it otherwise would have paid in the absence of Defendants' unlawful conduct.  This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.  Valspar is threatened with further injury.

201.     In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at Valspar's expense and detriment.

202.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, et seq.  Accordingly, Valspar seeks all relief available under Minnesota Stat. §§ 325D.49, et seq.

## COUNT III

### [Unjust Enrichment]

203.     Valspar incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

204.     As a result of their unlawful conduct described above, Defendants have and will continued to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, as a minimum, unlawfully inflated prices and unlawful profits on Titanium Dioxide.

205.     Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayment made by Valspar for Titanium Dioxide.

206.     Pursuant to Minnesota law, Valspar is entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct.  Valspar is entitled to the establishment of a constructive trust consisting of all ill-gotten gains.

### PRAYER FOR RELIEF

WHEREFORE, The Valspar Corporation and Valspar Sourcing respectfully request judgment be entered as follows:

1.  Defendants have combined and conspired in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), and that The Valspar Corporation and Valspar Sourcing have been injured in their business and property as a result of Defendants' violations;

2.  Defendants have combined and conspired in violation of Minnesota Statutes §§ 325D.49, et seq., and that The Valspar Corporation and Valspar Sourcing have been injured in their business and property as a result of Defendants' violations;

3.  The unlawful conduct, contract, conspiracy, or combination alleged in this Complaint be adjudged and decreed acts of unjust enrichment by Defendants as set forth in this Complaint;

4.  The Valspar Corporation and Valspar Sourcing recover damages, to the maximum extent allowed under applicable laws, and that a joint and several judgment in favor of The Valspar Corporation and Valspar Sourcing be entered against Defendants in an amount to be trebled to the extent such laws permit;

5.  Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

6.  The Valspar Corporation and Valspar Sourcing be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

7.     The Valspar Corporation and Valspar Sourcing recover their costs of suit, including reasonable attorneys' fees, as provided by law;

8.     All interest on the above-described amounts as allowed by law; and

9.     Such other relief as the Court deems equitable, necessary, just or proper.

## JURY DEMAND

The Valspar Corporation and Valspar Sourcing demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

## ACKNOWLEDGMENT

The undersigned hereby acknowledges that sanctions, including costs, disbursements, and reasonable attorney and witness fees, may be awarded pursuant to Minn. Stat. § 549.211.

DATED:     __November 22, 2013__          **LINDQUIST & VENNUM LLP**


By___s/ James M. Lockhart_____
        James M. Lockhart (#0176746)
        *jlockhart@lindquist.com*
        James P. McCarthy (#0069474)
        *jmccarthy@lindquist.com*
        John C. Ekman (#0276480)
        *jekman@lindquist.com*
        Jessica L. Meyer (#0387195)
        *jmeyer@lindquist.com*
4200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402-2274
(612) 371-3211
(612) 371-3207 (facsimile)

**ATTORNEYS FOR PLAINTIFFS**